IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
JEROME T. RIDGEWAY, JR. and    )
OLIVIA C.S. RIDGEWAY,          )
                               )
          Plaintiffs,          )
                               )
     v.                        )   Civ. No. 03-386-SLR
                               )
THE UNITED STATES OF AMERICA,  )
                               )
          Defendant.           )
                               )
```

---

William D. Fletcher, Jr. Esquire, of Schmittinger and Rodriguez, P.A. Dover, Delaware. Counsel for Plaintiffs.

Colm F. Connolly, United States Attorney, Patricia C. Hannigan, Assistant United States Attorney and Douglas E. McCann, Assistant United States Attorney for the District of Delaware, Wilmington, Delaware. Counsel for Defendant.

---

**OPINION**

Dated: September $\partial^{q}$, 2006
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

Plaintiffs Jerome Ridgeway and his wife Olivia Ridgeway filed this medical negligence action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., on April 15, 2003.  (D.I. 1, 18)  The suit arises from medical care provided to Jerome Ridgeway by employees of defendant United States of America at its Veterans Administration hospital ("VA") in Elsmere, Delaware. A four day bench trial commenced on May 2, 2005.  (D.I. 66)  Post trial briefing is complete.  (73, 76, 77)  The court has jurisdiction under 28 U.S.C. § 1346(b).  Pursuant to Fed. R. Civ. P. 52(a), the following are the court's findings of fact and conclusions of law.

## II.   FINDINGS OF FACT

1.    On November 24, 1998, plaintiff, an uncircumsized, twenty-year military service retiree, arrived at the VA seeking treatment for paraphimosis[1].  (D.I. 65 at 45-46, 192, 197-199)

2.    In addition to paraphimosis, plaintiff had a history of medical problems, including type II diabetes mellitus,

---

[1]Paraphimosis is an urologic emergency where the penis foreskin retracts back and, under certain conditions, will scar, become inflamed and form a tight band-like constriction around the head of the penis.  (D.I. 69 at 12)  It requires immediate reduction by bringing the skin back to its normal position either through manual manipulation or emergency circumcision.

hypertension, psoriasis,[2] herpes simplex II in the genital area, erectile dysfunction[3] and balanitis.[4]  Plaintiff developed psoriasis in the mid-1980s.  The condition was found to be a service connected disability related to serving in desert areas during Desert Storm and Desert Shield.  (Id. at 153)

3.    Dr. Kenneth Fitzpatrick, chief urology resident at the VA, examined plaintiff and manually repositioned the foreskin back down over the head of plaintiff's penis.  (D.I. 65 at 45, 197)  Dr. Fitzpatrick recommended that plaintiff have a circumcision to avoid recurrence of paraphimosis.  (Id. at 45, 46, 197)

4.    Plaintiff returned to the VA on December 7, 1998 for a physical examination.  (Id. at 47-48)  Dr. Fitzpatrick again recommended that plaintiff have a circumcision. Plaintiff agreed, signed a consent form, and the surgery was scheduled for January 7, 1999.  (Id. at 46, 48; JX 19)

----

[2]Psoriasis can manifest as plaques and pockmarks on the skin.  (D.I. 69 at 145)  According to Dr. Navajeevan Chakkaravardhi, board certified in internal medicine and gastroenterology, psoriasis can also cause skin lesions, scarring, pain and ulcerations.  (D.I. 68 at 102)  Dr. Chakkaravardhi is employed by the VA and examined plaintiff in connection with plaintiff's request for compensation review made in 1999.  (Id. at 92; JX 90)

[3]Plaintiff visited an impotency clinic in 1998.  (D.I. 69 at 32-33, 114, 115, 116)

[4]Balanitis is the general inflammation of the penis.  (D.I. 69 at 13)  It is a common condition in diabetics.

5.    Pre-operative testing was performed.  Plaintiff's
glucose reading was high at 350.  (D.I. 67 at 110, 111)  Diabetes
interferes with wound healing and can increase the risk of
infection.  (Id. at 113)  Plaintiff's weight was recorded at 300
pounds.  (D.I. 69 at 31)

6.    The surgical team assigned to plaintiff's circumcision
were: (1) Dr. Jerome Zink, a resident who started his urology
rotation about seven days before the surgery; (2) Dr. Joe Gueco,
attending surgeon; and (3) Dr. Robert Hong, chief urology
resident.  (D.I. 67 at 77)  Prior to the surgery, lines were
drawn on plaintiff's foreskin to serve as cutting guides for the
procedure.  (D.I. 65 at 80, 82)

7.    After receiving general anesthesia, Dr. Zink performed
the circumcision with the assistance of Drs. Hong and Gueco.
(D.I. 67 at 77)  This was the first time Dr. Zink performed a
circumcision.  (Id. at 77-78)  Dr. Zink reported finding a ring
of scar tissue that formed within the plaintiff's foreskin.  (Id.
at 75)  The removed foreskin specimen was sent to pathology for
examination.  (D.I. 65 at 50)  No unusual occurrence was recorded
in the surgical records prepared contemporaneous to the
procedure.  (JX 30)

8.    The pathology report noted the size of the foreskin
specimen as 5 by 3.7 by .4 cm and rectangular in shape.  (JX 34;
D.I. 68 at Id. at 57, 121-122)  Dr. William Hamilton, an

3

experienced VA pathologist, examined the specimen.  (D.I. 68 at 121)  Dr. Hamilton observed that the foreskin showed "chronic inflammation."  (JX 34)  Dr. Hamilton has reviewed numerous foreskin samples and considered plaintiff's specimen normal, of ordinary size and showed inflamation consistent with plaintiff's history of balanitis.  (D.I. 68 at 122, 124)

9.  In the recovery room after surgery, plaintiff's incision started to bleed and the surgical team was notified. (D.I. 65 at 53)  Dr. Zink arrived to find plaintiff had stopped bleeding and the incision was intact.  (D.I. 67 at 85)  However, plaintiff had developed a hematoma[5] in the incision site.  Dr. Zink examined and redressed the wound.  (Id. at 54)  Dr. Zink considered the best way to manage the situation and consulted with other urologists.  Because the incision was intact and bleeding had stopped, Dr. Zink concluded that the risks of reopening the incision, i.e., infection and cosmetic risk of recovery, were outweighed by taking no immediate action and waiting to see whether plaintiff's body would reabsorb the blood. (Id. at 85-86, 56)  Plaintiff was discharged that same day with an antibiotic, pain medication and post-surgical instructions. (Id. at 56, 63)

10.  On January 11, 1999, plaintiff wrote a letter to the Department of Veterans Affairs requesting a review of his 30%

---

[5]Hematoma is a collection of blood.  (D.I. 68 at 142)

4

disability rating due to a worsening of his psoriasis condition. (JX 85) Specifically, plaintiff referenced that he had psoriasis over 70% of "his total body area" and that the condition has "extensive exfoliation and is extremely repugnant." He further wrote, "the psoriasis condition has spread to my groin area and has caused me major problems with my penis. The condition has gotten so bad that I had a circumcision operation on 7 January 99 to hopefully relieve a painful condition." (Id.)

11. Plaintiff applied ice to the incision and took the pain medication for several days, without relief. (D.I. 65 at 57) On January 14, plaintiff returned to the VA for treatment because his genital area was swollen and bloody. (Id. at 58-59) Dr. Zink examined plaintiff and consulted with chief urologist Dr. Alex Raney. (Id. at 59) Dr. Raney recommended surgical removal of the hematoma and surgery was scheduled for the next day. (D.I. 69 at 132-135)

12. With plaintiff sedated under general anesthesia, Dr. Raney drained and evacuated the hematoma. (Id. at 139) No additional foreskin tissue was cut out, although some dead tissue was removed. (Id. at 60, 91; JX 37) Plaintiff stayed overnight at the VA.

13. In February, plaintiff returned for follow-up visits with Dr. Zink. (D.I. 65 at 63) Plaintiff complained that he did not have enough skin remaining on his penis to obtain pain-free

5

erections. (Id. at 64) As plaintiff explained, "when [he] got erections [his] penis was bending upward, upwards. And [he] didn't have enough skin for [the penis] to come out to have a full erection." (Id. at 65) Dr. Zink advised that the wound would take time to heal and, eventually, the skin would stretch and return to normal. (Id.)

14. Because plaintiff continued to have difficulty reaching normal, elongated erections and was experiencing pain, he consulted another urologist. Dr. Michael Zaragoza, a board certified urologist in private practice, treated plaintiff on one occasion in July 1999. (D.I. 67 at 52) Plaintiff complained of pain in the penis during erection and inadequate erections due to shortened skin on the left side of his penis. (Id. at 54) After physically examining plaintiff, Dr. Zaragoza determined that plaintiff's erectile difficulties were due to scarring that occurred at the circumcision and the removal of the hematoma. (Id. at 55) Dr. Zaragoza determined that a skin graft was necessary to replace the scarred, inelastic tissue with healthy, elastic tissue to restore normal erections and referred plaintiff to a plastic surgeon. (Id. at 56, 58-59) Dr. Zaragoza did not observe any psoriasis on plaintiff's penile shaft. (Id. at 59)

15. In early 2000, plaintiff's pain and discomfort during erections continued. (D.I. 65 at 68) He made an appointment with Dr. Michele Shermak, a board certified plastic surgeon

6

associated with Johns Hopkins University. (Id. at 69; D.I. 167 at
135, 137) After examining plaintiff and noting his complaints of
erectile dysfunction, pain with erections and the absence of
vaginal sex in his marriage, Dr. Shermak recommended a skin graft
to correct the problem. (Id. at 70-72)

16.  In various examination notes and letters to insurance
companies, Dr. Shermak describes plaintiff and his circumcision
as follows: "improper circumcision procedure" (id. at 168); an
"overzealous circumcision" (id. at 173); and "[plaintiff] was a
patient who was left with a disabling scar contracture of [his]
penis after a failed circumcision" (Id. at 168).

17.  On June 26, 2000, plaintiff's first skin grafting
surgery occurred. (D.I. 67 at 140; JX 103, 104) Dr. Shermak
removed the tightened skin on plaintiff's penis, created a wound
on the penis where she placed a piece of skin from another part
of his body. (D.I. 67 at 143, 72) Dr. Shermak viewed the
surgery successful because plaintiff's penis was now straight
and no longer bent. (Id. at 74; D.I. 65 at 74) However, Dr.
Shermak noted that plaintiff was still experiencing pain with
sexual intercourse and having problems with erections. (D.I. 67
at 153; JX 106) Dr. Shermak made these statements based on what
plaintiff told her and not with the benefit of having reviewed
his VA medical records. (D.I. 67 at 187)

7

18.   Because plaintiff still did not have enough skin to achieve  a complete erection, Dr. Shermak performed a second skin grafting in October 2000.  (D.I. 65 at 75; D.I. 67 at 154; JX 108, 109)  Dr. Shermak considered the surgery successful and noted that plaintiff was able to have sexual intercourse and was experiencing "much less pain."  (JX 114)

19.   A third and final surgical grafting occurred in November 2001.  (D.I. 65 at 76; D.I. 67 at 170)  Dr. Shermak noted that plaintiff reported a decrease in sexual activity due to lack of interest and loss of sensation.  (JX 115)  Dr. Shermak considered the third skin graft a success.  (D.I. 67 at 198) Plaintiff was satisfied with the results and indicated he was able to have full erections without pain.  (JX 118)

20.   During subsequent appointments with Dr. Shermak, plaintiff requested a prescription for Viagra[6] to assist with erectile dysfunction.  (Id. at 81, 109; D.I. 67 at 173; JX 118) Dr. Shermak's notes also indicate that plaintiff was "still not having normal sexual intercourse."  (D.I. 67 at 175)

21.   Dr. Shermak concluded, within a reasonable degree of medical certainty, that all of the procedures and treatment she provided were necessitated by the circumcision and hematoma evacuation.  (Id. at 182)

_____

[6]Viagra is a drug prescribed to patients with sexual dysfunction.  (D.I. 69 at 116)

8

22.   In 2002 and 2003, plaintiff was treated by Dr.
Frederick Kotler, a VA physician and board certified internist.
(D.I. 68 at 67)   Dr. Kotler treated plaintiff for diabetes,
psoriasis, erectile dysfunction, low testosterone levels and
hypertension.   (Id. at 71-76)   Dr. Kotler prescribed Viagra and
this prescription was refilled several times.   (Id. at 70)

23.   Dr. Irvin Hirsch testified as a defense medical expert.
(D.I. 69 at 2)   He is a clinical professor of urology in the
Department of Urology at Thomas Jefferson University, a board
certified urologist and a prolific writer on urology topics.
(Id. at 3, 4-5)   After reviewing the available records, reports
and statements, Dr. Hirsch concluded the circumcision was fully
indicated and it was well within the standard of care to allow a
first year resident (Dr. Zink) to perform the circumcision
because Dr. Zink actually had two years of surgery experience
before arriving at the VA.   (Id. at 18)   Dr. Hirsch found that
there was no medical evidence that too much foreskin was removed
during the circumcision.   (Id. at 19)   He opined that the most
likely causes of the elasticity deficiency in plaintiff's penis
were infection, inflammation and scarring.   (Id. at 23)

24.   Dr. Hirsch observed that the foreskin specimen was very
thick, which indicates previous inflammation and scarring.   (Id.
at 17, 23-24)   Psoriasis and diabetes can cause problems with
wound healing.   (Id. at 23-24)   Dr. Hirsch also found, in

9

plaintiff's history, numerous dermatology visits for scarring, scarring of the scalp and other areas of the body" (id. at 25), all of which and led him to conclude:

> [W]hen surgery is superimposed on someone who's an intrinsic scarrer, then we have the process of scarring and deficiency of elasticity of the area that is operated on. It was present after the circumcision. It was present after a couple of the grafting procedures that had to be redone because of scarring and contracture. So I think there's an intrinsic patient-related attribute of scar tissue formation and a tendency and predilection to scar formation.

(Id. at 25; 130)

25. With respect to the hematoma, Dr. Hirsch determined that the decision to watch and wait rather than surgical intervention was well within the acceptable standard of care. (Id. at 26-28, 97) The decision to evacuate the hematoma, as well as the treatment utilized approximately one week later, was appropriate and within the acceptable standard of care. (Id. at 29-30)

26. Plaintiff's expert Dr. Alan Geringer, a board certified urologist in private practice, concluded there was a breach in the standard of care because too much foreskin was removed during the initial circumcision, which was complicated by the second procedure. (D.I. 68 at 139, 151) Dr. Geringer reviewed available records, statements and reports. He based this opinion largely on the remarks made by Dr. Zaragoza and Dr. Shermak. He opined that there was error in drawing the lines pre-surgery and

10

that too much skin was removed because plaintiff was overweight. (Id. at 140, 144) Further, he concluded that the hematoma could have led to scarring of the penile skin which could have inhibited full expansion of the penis. (Id. at 144)

27. Dr. Geringer was not able to conclude from the pathology report that too much foreskin had been removed. (Id. at 150, 161) Instead, Dr. Geringer surmised that too much foreskin had been removed by looking backwards from Dr. Zaragoza's report and Dr. Shermak's notes, which include the finding of a "skin deficit." (Id. at 150, 165-166) By deduction, Dr. Geringer concluded that the only way the shortage could have occurred was by the circumcision which removed too much skin. (Id.) Although scarring can lead to a deficiency in the penile skin, Dr. Geringer does not believe psoriasis played a role in the circumcision or the healing process. (Id. at 154-156)

28. Dr. Geringer could not conclude that the standard of care was deviated when the physicians did not remove the hematoma immediately after the circumcision. (Id. at 164) Specifically, he opined, "[i]t's a judgment call, I wasn't there." (Id. at 164-165)

**III. CONCLUSIONS OF LAW**

1. This Federal Torts Claim of medical negligence is brought under Delaware's Health Care Medical Negligence Act, 18 Del. C. § 6801 et seq. Under § 6801(7), negligence is defined as

11

> [a]ny tort or breach of contract based on health
> care or professional services rendered, or which
> should have been rendered, by a health care provider to
> a patient.

Further,

> [t]he standard of skill and care required of every
> health care provider in rendering professional
> services or health care to a patient shall be that
> degree of skill and care ordinarily employed in the
> same or similar field of medicine as defendant, and
> the use of reasonable care and diligence.

2.  The Act mandates expert testimony be presented as the

to the alleged deviation from the applicable standard of care in

"the specific circumstances of the case and as to the causation

of the alleged personal injury or death." 18 Del. C. § 6853(e).

To that end, the Delaware Supreme Court has concluded that the

fault standard imposed by the Act requires that a qualified

expert opine that the challenged care was both negligent and the

cause of the alleged injury. McCusker v. Surgical Monitoring

Assocs., 299 F. Supp. 2d 396, 398 (D. Del. 2004). Unusual or

disturbing results alone are not sufficient evidence of

malpractice or negligence. Timblin v. Kent General Hosp., 640

A.2d 1021, 1024 (Del. 1994). Moreover, when a "physician chooses

between appropriate alternative medical treatments, harm

resulting from a physician's good faith choice of one proper

alternative over the other is not medical malpractice." Corbitt

v. Tatagari, 2001 WL 1482635 at *1 (Del. Super. 2001).

12

3.     Proximate cause is defined as "but for," <u>Culver v.</u>
<u>Bennett</u>, 588 A.2d 1094, 1097 (Del. 1991), so the defendant
physician's "conduct is a cause of the event if the event would
not have occurred but for that conduct." The defendant doctor's
"conduct is not a cause of the event if the event would have
occurred without it." <u>Id.</u>

4.     Plaintiffs allege that defendant, through its agents,
failed to provide the requisite standard of medical care to
plaintiff when he underwent the circumcision procedure at the VA
on January 7, 1999. They allege that this breach of the standard
of care was the direct cause of the injuries and damages of which
plaintiff complains. After considering the evidence of record,
trial testimony and the demeanor of those testifying witnesses,
the court cannot conclude that plaintiffs have carried their
burden of demonstrating, by a preponderance of evidence, that
there was a deviation from the standard of care.

5.     Plaintiffs allege each defendant physician breached
standards of care in different ways. However, each theory
centers around whether the January 7, 1999 circumcision was
properly performed. As a result, any deviations in the pre-
surgical marking, the procedure itself or the supervision of it,
gives rise to the negligence of defendant.

6.     Plaintiffs' theory of excessive skin removal rests in
large part on the testimony of their expert, Dr. Geringer. The

13

physician's opinion, however, is based more upon bare conclusions than on an adequate factual foundation. For example, Dr. Geringer finds negligent care merely because of a "deficit of skin" and deduces the cause by tracing the events backwards. This opinion lacks a specific explanation of how and by what manner the physicians deviated from standard practice, e.g. too deep an incision. It also ignores Dr. Geringer's own concession that a process outside of surgery could lead to a similar result and is in direct conflict with defense expert Dr. Hirsch's view that no physician deviated in any manner from the accepted standard of care for the pre-surgical or surgical process.

7.    The court found credible Dr. Hirsch's opinion that the VA team adhered to the standard of care in the pre-surgical and surgical management of plaintiff's condition. His opinion is based upon an adequate factual foundation, including a pathology report showing the area of excess skin was within the average range for this procedure. This view is supported by the pathologist himself, Dr. Hamilton, who testified that the excised skin was a size typical for circumcision. Further, the VA team present during surgery contemporaneously recorded no unusual events. (JX 30)

8.    Plaintiffs next assert that the care rendered in the post-surgical process, or the lack of it, deviated from the standard of care. Specifically, they claim that the physicians

14

failed to adequately treat his post-surgical hematoma which led
to complications and contributed to his poor post-operative
course.  The totality of the evidence, however, when considered
against the applicable law, fails to support this theory.

9.    Specifically, under Delaware law, a physician who
exercises judgment in the face of a competing option is not said
to have deviated from the standard of care.  Corbitt v. Tatagari,
2001 WL 1482635.  As long as the opinion is viable, no negligence
exists.  Id.  Here, Drs. Geringer and Hirsch agree that the
physicians' decision to opt for a conservative course in treating
the hematoma was a discretionary exercise in judgment.
Regardless of the outcome, a conservative course was undisputably
a viable alternative to a second surgery and not a basis for
negligence.

10.    Alternatively, plaintiff's surgical and post-surgical
course was not a proximate result of any act of the physicians
involved in the circumcision or evacuation.  Even if the court
were to find that deviation from the standard of care existed,
the record does not establish that any said deviation led to
harm.  Plaintiff's extensive medical history, including his own
admissions and findings of disinterested physicians, prevent a
finding of the causal link necessary for plaintiffs to prevail.
Specifically, plaintiff admits to psoriasis in the genital area
before the 1999 surgery and advised the VA in a letter composed

15

immediately after his surgery that the circumcision was due to a
spread of psoriasis to his penis.  It is undisputed that
psoriasis complicates the healing process and that plaintiff had
a history of excessive scarring.  This is particularly relevant,
according to Dr. Hirsch, because the pathology sample showed
usually thick tissue, consistent with preexisting inflammation
and scar tissue build-up.  This build-up, in turn, prevents skin
"elasticity" and contributes to precisely the complaints
plaintiff presents here.  Even plaintiff's expert, Dr. Geringer,
concedes that scarring itself - unrelated to surgery - may lead
to a deficiency in penile skin.  Accordingly, the record suggests
that plaintiff's own, unique medical history and conditions
likely caused the problems he experienced after surgery.[7]

## IV.  CONCLUSION

For the reasons stated, plaintiffs have not demonstrated a
violation of the Federal Torts Claim Act.  An appropriate order
shall issue.

---

[7]In so finding, it is unnecessary to reach defendant's
arguments regarding plaintiff's allegedly contradictory
statements, his erectile dysfunction or his use of Viagara.
Although the court's findings of facts allude to same, this
information is insignificant to the conclusions reached regarding
the standard of care rendered by defendant.  Similarly, in light
of the conclusions reached, the testimony of plaintiff Olivia
Ridgeway and, specifically, the impact plaintiff's medical
condition has had on her life, are not reflected in the findings
of fact.

16